IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN RE: ALLEGIANCE COAL USA LIMITED, *et al.*, | : : : | Chapter 11 Bankr. No. 23-10234-CTG |
| Debtors. | : | |

| | | |
|---|---|---|
| COLLINS ST CONVERTIBLE NOTES PTD LTD., | : : | Civ. No. 24-656-CFC |
| Appellant, | : | Civ. No. 24-926-CFC |
| v. | : : | (consolidated) |
| ALLEGIANCE COAL USA LIMITED, *et al.,* | : : | |
| Appellees. | : | |

Christopher M. Samis, Katelin A. Morales, POTTER ANDERSON & CORROON LLP, Wilmington, Delaware; Stephen D. Lerner, F. Maximilian Czernin, Scott W. Coyle, Kyle F. Arendsen, SQUIRE PATTON BOGGS (US) LLP, Cincinnati, Ohio,

*Counsel for Appellant Collins St Convertible Notes Pty Ltd.*

Robert J. Dehney, Matthew B. Harvey, Daniel B. Butz, Brenna A. Dolphin, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Richard W. Riley, WHITEFORD, TAYLOR & PRESTON LLP, Wilmington, Delaware; David W. Gaffey, WHITEFORD, TAYLOR & PRESTON LLP, Falls Church, Virginia; Patrick A. Jackson, Faegre Drinker Biddle & Reath LLP, Wilmington, Delaware; Mark D. Taticchi, Faegre Drinker Biddle & Reath LLP, Philadelphia, Pennsylvania,

*Counsel for the Appellees CRS Capstone Partners, LLC, Dundon Advisors, LLC, and Stretto, Inc.*

## **OPINION**

March 31, 2025
Wilmington, Delaware

_Col F. C_____
COLM F. CONNOLLY
CHIEF JUDGE

This dispute arises in the chapter 11 cases of Allegiance Coal USA Limited and its debtor affiliates (together, the "Debtors"). Collins St Convertible Notes Pty Ltd.[1] ("Appellant') was a pre-petition lender to the Debtors. During the bankruptcy, Appellant agreed to provide an additional $5 million in debtor-in-possession ("DIP") financing. The final order approving the DIP financing (A719-A802)[2] ("DIP Order") created a so-called "Carve-Out" (A754-55, ¶ 17) to which professionals retained in the chapter 11 cases ("Retained Professionals") could look for payment of fees and expenses. The Carve-Out created by the Final DIP Order is expressly senior and superior in rank of priority of payment to all of Appellant's liens and claims.

Ultimately, the chapter 11 cases were not successful, as the Debtors were unable to either reorganize their business or find a going-concern buyer, and proceeds from the liquidation of the Debtors' mining equipment brought in less than

---

[1] Appellant refers to Collins St Convertible Notes Pty Ltd, as trustee for The Collins St Convertible Notes Fund, and in its capacity as both the DIP Lender and Prepetition Noteholder.

[2] The docket of the chapter 11 case, captioned _In re Allegiance Coal USA Limited, et al._, No. 23-10234-CTG (Bankr. D. Del.) is cited herein as "B.D.I. __." The appendix (D.I. 25) filed in support of Appellant's opening brief is cited herein as "A__," and the appendix (D.I. 30) filed in support of Appellees' answering brief is cited herein as "SA__."

the cost of administering the estate. The Bankruptcy Court entered an order providing for the dismissal of the cases, with the remaining cash to be distributed in accordance with the statutory waterfall. The cash in the estate was insufficient to pay the Retained Professionals' fees in full. Appellant objected to the allowance of the Retained Professionals' fees, arguing principally that the DIP Order permitted the Debtors to make payments only as set forth in an approved budget. The agreed budgets contained only an accrual of unpaid professional fees and did not provide for any cash to be paid to Retained Professionals during the periods they covered. Appellant argued that it had sole discretion under the DIP Order to approve any payments from its cash collateral and the DIP proceeds, that it never approved any of the accrued professional fees listed in the approved budgets, and, accordingly, no amount could be paid to Retained Professionals (and any interim payments made pursuant to Bankruptcy Court orders must be disgorged).

On June 7, 2024, following briefing, a hearing, and a bench ruling, the Bankruptcy Court issued its Amended Memorandum Opinion, *In re Allegiance Coal USA Limited*, 661 B.R. 874 (Bankr. D. Del. 2024) (the "Opinion"). Based solely on the language of the DIP Order, the Bankruptcy Court held that "the absence of any amount being shown as cash to be paid to estate professionals in any budget period means only that company's cash could not be used to pay professionals *in the period in question*. The DIP Order is otherwise clear, however, that the repayment of the

2

DIP loan is subordinated to the payment of amounts protected by the Carve Out, which includes the professional fees shown as being accrued." *Id.* at 878.  The Bankruptcy Court further ruled that the Retained Professionals' "fees and expenses are 'reasonable compensation for actual necessary services' within the meaning of § 330 of the Bankruptcy Code." *Id.* at 878-79 (quoting 11 U.S.C. § 330).

Appellant timely appealed the May 20, 2024 *Final Omnibus Order Granting Final Allowance of Fees and Expenses for Retained Professionals* (A1447-A1450) (the "Final Fee Order").  Civ. No. 24-656-CFC, D.I. 1.  Appellant also timely appealed the July 25, 2024 *Final Order Dismissing the Debtors' Chapter 11 Cases* (A1481-A1484) (the "Final Dismissal Order").  Civ. No. 24-926-CFC, D.I. 1. These appeals were consolidated and fully briefed.  D.I. 24, 29, 31.[3]  No party requested oral argument.  For the reasons set forth herein, I will affirm the Final Fee Order and the Final Dismissal Order.

## I.    BACKGROUND

### A.    The Debtor and the Chapter 11 Cases

On February 21, 2023, the Debtors filed petitions under chapter 11.  A1-11, A722.  It is undisputed that, from the filing of the petitions through early April 2023,

---

[3] Hereafter, "D.I. __" shall refer to the docket of the consolidated appeal, Civ. No. 24-656-CFC.

the Debtors and Appellant battled over whether the Debtors should be in bankruptcy at all and how the bankruptcy cases should be funded. A1423.

Shortly after filing their bankruptcy petitions, the Debtors filed a motion to use cash collateral—which was subject to Appellant's liens—to continue operating their mines. *See* A12. To support this request, Debtors' counsel elicited testimony at the first day hearing on February 23, 2023, purporting to show that continued use of cash collateral to fund the Debtors' operations would "generate positive cash flow." A58-59. The Debtors' then CFO, Chris Walker, presented budgets forecasting positive net cash flows over the next 15 weeks, "notwithstanding the fact that the Debtors ha[d] never had positive monthly cash flows" prior to their bankruptcy filing. A72. Debtors' counsel also elicited testimony regarding the alleged value of the Debtors' assets, in an attempt to show that secured creditors like Appellant would be adequately protected from the use of their cash collateral. The Debtors' then CEO, Jonathan Romcke, testified that the "asset value" for the two operating mines was $16 million for the Black Warrior Mine in Alabama and $43.6 million for the New Elk Mine in Colorado. A94. Appellant opposed the Debtors' motion to use cash collateral, arguing that the Debtors' assets would be better used to immediately begin a marketing and sales process. A149-50. Over Appellant's objection, the Bankruptcy Court granted the Debtors' motion to use cash collateral to continue funding mining operations. *See* A26 (interim cash collateral order), 156-

4

57. To protect Appellant from a diminution in the value of the cash collateral, the Bankruptcy Court granted Appellant a "replacement lien" on "the proceeds of the Debtors' mineral leases and unencumbered assets." A30-31.

It appears that Appellants were right. Despite the optimistic projections presented at the First Day Hearing, the Debtors failed to meet their cash flow projections and soon found themselves running out of cash, and the Debtors began contacting potential lenders, including Appellant, to pursue DIP financing. A224-29.

### B.    The DIP Order

Appellant ultimately agreed to provide the Debtors with DIP financing to fund a sale process with respect to the Debtors' assets (and Appellant's collateral). A719-802. While Appellant now claims it did so under duress, or with foreknowledge that the sale process would be fruitless, Appellant was not forced to lend and could have sought conversion or dismissal of the Debtors' chapter 11 cases as alternatives. *See* D.I. 24 at 1-2, A1184-85, A1187-88. Appellant chose to allow use of its cash collateral and fund additional capital through DIP financing to allow the Debtors to seek to maximize the value of their assets for Appellant's benefit and avoid liquidation. A1275-76, A1278-79.

By all accounts, from March through May 2023, Appellants and the Debtors "heavily negotiated" a DIP agreement and exchanged "numerous" drafts of term

sheets, proposed budgets, and financing orders.  Notably, each of the draft DIP budgets proposed by the Debtors included the payment of over $3.4 million in professional fees—an issue that emerged as a key point of contention among the parties.

The Final DIP Order provided that DIP funds and collateral could be used "only as and to the extent authorized by the Approved Budget and the DIP Documents."  A735.  "Approved Budget" was a defined term meaning a "detailed budget that sets forth projected cash receipts and cash disbursements on a weekly basis for the time period that has been approved by the DIP Lender."  A735-36.  The DIP Order and Term Sheet provided that Appellant was not obligated to accept any budget proposed by the Debtors and maintained "sole discretion" to accept or reject any updates or modifications to the initial Approved Budget.  *See* A736, 782, 784

As is customary,[4] the parties negotiated a professional fee budget and Carve-Out to cover the Debtors' and the Committee's professionals.  The DIP Order

---

[4] *See, e.g.*, *In re Licking River Mining, LLC*, 911 F.3d 806, 809 (6th Cir. 2018). ("Attorneys and other professionals hired to assist in the reorganization generally require that the cash collateral agreement include a provision called a 'carve-out' whereby the secured creditors 'carve out' sums from cash collateral to ensure payment of certain fees and expenses.  This provision limits the risk to the hired professionals by giving them priority to payment from cash collateral in the event of insolvency"); *In re Ames Dep't Stores*, 115 B.R 34, 40 (Bankr. S.D.N.Y 1990) ("A failure to provide a reasonable sum for professionals has, in other cases before this Court, left estates, creditors' committees and trustees without the assistance of counsel and the Court without the adversary system contemplated by Congress in 1978 when it, in enacting the Bankruptcy Code, recast the role of bankruptcy judges

contains customary language providing that all of Appellant's lines and claims are subordinated to the Carve-Out.  A754-56.  That provision assured the Retained Professionals that any payments authorized under the DIP Order, and allowed by the Bankruptcy Court, would be paid before Appellant recovered on its own liens and claims against the Debtors.  As is also customary, the Carve-Out covered the allowed fees and expenses of the Retained Professionals up to an agreed cap for so long as no event of default was noticed under the Final DIP Order.  A754–56.

Specifically, paragraph 17 of the Final DIP Order creates the Carve-Out and provides that Appellant's liens and claims "shall be subject and subordinate only to *the payment of* . . ." the allowed fees and expenses of the Retained Professionals, up to the amounts in a professional fee accrual schedule attached to the Approved Budget, so long as they were incurred before delivery of a "Carve-Out Trigger Notice."  A754-56.  This is reflected in the language of the Final DIP Order:

> [Appellant's liens and claims] shall be subject and subordinate only to the payment of[,] . . . *up to* the amounts set forth in the Approved Budget, including *the amounts in the professional fee accrual schedule attached to the Approved Budget, to the extent allowed at any time, whether by interim order, procedural order, or otherwise, all unpaid fees and expenses* . . . of persons or firms retained by the Debtors pursuant to sections 327, 328, or

principally to one of resolving disputes.") *id*. at 38 ("it has been the uniform practice in this Court . . . to insist on a carve out from a [secured creditor's] super-priority status and post-petition lien in a reasonable amount designed to provide for payment of the fees of debtor's and the committees' counsel and possible trustee's counsel in order to preserve the adversary system.").

7

363 of the Bankruptcy Code (the "Debtor Professionals")
or by the Creditors' Committee pursuant to sections 328 or
1103 of the Bankruptcy Code (the "Committee
Professionals" and, together with the Debtor Professionals,
the "Professional Persons") that *are incurred or earned at
any time before or on the first Business Day following
delivery by the DIP Lender of a Carve-Out Trigger Notice*
(as defined below), whether allowed prior to or after
delivery of a Carve-Out Trigger Notice[.]

A754-56 (emphasis added). In relevant part, a "Carve-Out Trigger Notice" is "a

written notice … delivered [by Appellant] following the occurrence and during the

continuation of an Event of Default under the DIP Term Sheet." A755.

The DIP Order included an Approved Budget covering the one-week period

ending on May 19, 2023. A801-802. The "professional fee accrual schedule

attached to the Approved Budget" is annexed to the Approved Budget. A802. The

second Approved Budget filed in the bankruptcy cases on May 24, 2023, covered

the six-week period ending on June 30, 2023, and showed $5,736,839 of total

projected professional fee accruals. A821. Neither Approved Budget reflected

payment of the Retained Professionals' fees during the time period it covered. In

each, the line item for payment of professional fees was marked "-" (*i.e.*, $0). A802,

A821. The second footnote in the professional fee accrual schedule states that,

consistent with the Carve-Out, "estimated payments of professional fees are subject

to allowance by the Bankruptcy Court, the Carve-Out, and fee application

timeframes." A821. It makes no mention of any additional requirement.

8

There is no dispute that: (1) the professional fees and expenses paid in this case are within the amounts set forth in the "the professional fee accrual schedule attached to the Approved Budget" because they total less than $5,736,839; (2) all professional fees and expenses were allowed by interim order, procedural order, or final order of the Bankruptcy Court before they were paid; and (3) Appellant never delivered a Carve-Out Trigger Notice, so all the fees and expenses were incurred prior to the delivery such a notice.

### C.    The Unsuccessful Sale

With Appellant's support, the Debtors engaged in a postpetition marketing process to sell or reorganize their business as a going-concern.  A1278–79, A1284–85.  Appellant and the Committee worked hand-in-hand with the Debtors because all parties agreed that a going-concern transaction sale was likely to be value maximizing.  Consistent with this view, Appellant's financial advisor recommended exhausting the going-concern sale efforts before pivoting to any liquidation sales. A1278-79 (Appellant's financial advisor testified that, at the time of the DIP loan, "we just want to fund the minimum amount to allow for the completion of that sale process and then make a call on where we go from there."); A1304-05 (Q: Did you ever recommend to [Appellant] that they pursue converting the case to chapter 7?" A: [Appellant's financial advisor] "The recommendation was to complete the sale process in Chapter 11 as quickly as possible and at little cost as possible").  Despite

the parties' best efforts, the sale process was unsuccessful. When no actionable going-concern bids materialized, the Debtors, in consultation with Appellant and the Committee, determined that a going-concern was no longer feasible. The failed going-concern sale meant that by June 2023 at the latest (if not earlier), the Debtors were in default under the DIP Order, and Appellants could have noticed an event of default that would have constituted a "Carve-Out Trigger Notice" and cut off further professional fee accruals under the Carve-Out. A774-75, A1306. Appellant did not exercise this right at that time (or any time), and instead allowed professional fees to continue to accrue under the Carve-Out. *Id.*

The Debtors pivoted to asset liquidation auctions at Appellant's direction. A1284-85, A1294, A1300. At Appellant's direction, the Debtors retained Ritchie Bros. Auctioneers (America) Inc. and IronPlanet, Inc., to auction certain of the Debtors' equipment. A948. In total, the equipment liquidation efforts generated $6.2 million in proceeds. A1300.

### D.    Interim Fee Payments

As is typical in chapter 11 cases, the Debtors sought, and the Bankruptcy Court approved, procedures for the Retained Professionals to apply for and receive interim fee and expense payments. SA0102-10. The procedures authorized professionals to file monthly fee applications. Parties in interest, including Appellant, then had 14 days to object. SA0108. If no objection were filed, then the

10

professional was eligible to be paid 80% of its requested fees and 100% of its requested expenses without further Bankruptcy Court order. SA0108. At quarterly intervals, professionals could apply for the remaining 20% holdback, and parties in interest, including Appellant, had a second opportunity to object. SA0108-09. When no objection was filed, the Bankruptcy Court entered orders allowing and directing payment of the requested fees. A885, A889.

The Debtors began paying the allowed fees and expenses of the Retained Professionals in September 2023. SA1644. The proceeds received from the asset liquidations in August and September 2023 enabled those payments. A948, SA1355-57. Earlier payment was not possible because the Debtors had insufficient liquidity. SA1355-57, SA1367.

### E.    The Adversary Proceeding and the Initial Dismissal Order

With their material assets sold, and lacking sufficient available funds to continue their bankruptcy cases, the Debtors moved to dismiss their bankruptcy cases in early February 2024. A941. As part of that motion, the Debtors proposed to distribute their remaining cash pursuant to the priority scheme set forth in the DIP Order and the Bankruptcy Code; first paying to fund the Carve-Out, with any remaining value being paid to Appellant. A950-51, A959-60, A1500. The motion also contemplated a two-stage process: first, entry of an initial dismissal order that established the procedures for Retained Professionals to file final fee applications,

11

and, second, once all fee applications and other disputes had been resolved, entry of a final dismissal order.  A964-65, SA2193-2204.

A week later, Appellant initiated an adversary proceeding by filing a complaint seeking a declaration that its own professional fees were senior to the Carve-Out pursuant to ¶ 10 of the Final DIP Order.  A1488-98.  Shortly thereafter, Appellant filed an objection to the Debtors' motion to dismiss the bankruptcy cases, arguing that the initial dismissal order should not be entered until, *inter alia,* (i) its adversary proceeding and the Carve-Out priority issue therein was resolved, and (ii) the Debtors clawed back prior payments made to estate professionals that it alleged were improper.  A979, A983-85.  On March 8, 2024, the Bankruptcy Court ruled that Appellant's adversary proceeding must be resolved before it could reach the initial dismissal order.  SA2607, SA2612-13.

Thereafter, the Debtors moved to dismiss the Appellant's complaint in the adversary proceeding.  Following briefing, the Bankruptcy Court issued a letter decision on March 28, 2024, granting the Debtors' motion to dismiss the complaint (A1499-1509, SA3356-57) (together, the "Letter Opinion").  The Bankruptcy Court ruled that the Final DIP Order was unambiguous, that paragraph 17 of the Final DIP Order provided for the Carve-Out and the DIP Liens were subordinate to the Carve-Out, and that the Final DIP Order did not elevate Appellant's fees and expenses over the Carve-Out.  A1503, A1506-08.  Although the Bankruptcy Court recognized that

12

payment of Retained Professionals without an Approved Budget may have been an event of default under the Final DIP Order, it held that it did not follow that payments to Appellant would come ahead of the Carve-Out because Appellant would just have had "whatever remedies it negotiated for under the [Final DIP Order] upon the occurrence of a default." A1507. "A carve-out, after-all, provides its beneficiaries the right to be paid out of the very highest priority obligation created by the [Bankruptcy] Code." A1508. Consistent with its Letter Opinion, the Bankruptcy Court entered an order dismissing Appellant's complaint on April 3, 2024. SA3356. Appellant did not appeal that order.

The Retained Professionals submitted final fee applications seeking over $5 million in professional fees. *See* A1049, 1058, 1080, 1107, 1115. In total, the Retained Professionals submitted 762 pages of detailed time entries as part of requesting the Bankruptcy Court's approval of their final fee applications. The total amount of fees and expenses sought by the Retained Professionals on a final basis was $5,311,502.96—below the more than $5.7 million total amount provided in the Carve-Out. SA2910, SA3219, SA3335.

The fees requested by the Retained Professionals exceeded, however, the Debtors' cash following the sale process and left the estates administratively insolvent, meaning the fee applications—if approved by the Bankruptcy Court—

would leave Appellant with no hope of recovering anything on its secured claims, including the DIP loan.  A1002-03.

###    F.    The Final Fee Order

Appellant objected to the final fee applications submitted by the Retained Professionals for two reasons underlying the issues on appeal.  First, relying on the plain language of the DIP Order, Appellant argued that the Debtors could not use cash collateral, DIP funds, or DIP collateral to pay the Retained Professionals because none of the requested payments were authorized by Appellant in an Approved Budget.  *See* A1204-10.  The only Approved Budgets filed by the Debtors allocated "-" for the payment of professional fees.  According to Appellant, this notation "evince[ed] the parties' clear agreement that the Retained Professionals would not receive payment unless the sale proceeding culminated in a successful transaction" and the Carve-Out did not erase the requirement that any payment must be authorized in an Approved Budget.  *See id.*  Second, Appellant argued that even if the DIP Order permitted the payment of professional fees without Appellant's approval, the fees requested by the Retained Professionals were not reasonable.  *See* A1210-19.  Neither party sought discovery.

The Bankruptcy Court held a hearing on the final fee applications on May 7, 2024.  Although both sides argued that the Final DIP Order was unambiguous and dictated an outcome in their favor, the Bankruptcy Court allowed the parties to

14

present evidence supporting the parties' alleged intent in the event the Bankruptcy Court were to find ambiguity. A1280-81, A1326-28, A1342-44. Appellant also offered testimony of its financial advisor to question the qualifications of the Debtors' investment banker ("Capstone") as well as to critique the sale process, but that testimony did not touch on the reasonableness of the fee requests. A535-541, A1293-95. The Bankruptcy Court took the matter under advisement. A1406-08.

The Bankruptcy Court issued a bench ruling on May 10, 2024, overruling Appellant's objections and allowing the final fee applications submitted by the Retained Professionals. *See* A1419-46 ("5/10/24 Tr."); 1447-50. Pursuant to Local Rule 8003-2, the Bankruptcy Court then supplemented its bench ruling with the Opinion. The Bankruptcy Court found, much as it had in the Letter Opinion, that the DIP loan documents were unambiguous. *In re Allegiance Coal*, 661 B.R. at 882. The Bankruptcy Court held that "the absence of any amount being shown as cash to be paid to estate professionals in any budget period mean[t] only that company's cash could not be used to pay professionals *in the period in question*. The DIP Order is otherwise clear, however, that the repayment of the DIP loan is subordinated to the payment of amounts protected by the Carve Out, which includes the professional fees shown as being accrued." *Id*. at 878. At the end of the bankruptcy cases, where there was no Approved Budget, the DIP Order does not preclude payment of professional fees. *See id*. at 878.

15

The Bankruptcy Court held that the overall structure of the Final DIP Order provided that as between the Carve-Out and Appellant, the repayment of Appellant's DIP loan was subordinated to the Carve-Out. *Id.* at 888. It noted, that, even if interim payments made by the Debtors were unauthorized at the time, the result at the end of the bankruptcy cases would be the same because the documents made it clear that in the end, repayment of the DIP loan was subordinate to the Carve-Out. *See id.* Accordingly, any "premature payment of funds to parties who are ultimately entitled to receive them caused [Appellant] no injury." *Id.* Essentially, while Appellant had the right, by refusing to agree on an Approved Budget, to prevent cash payments from being made in a given period," the "indefinite exercise of that right would not mean that Appellant would recover ahead of the Carve Out." *Id.* At the end of the bankruptcy cases, if the Debtors had cash on hand, the Retained Professionals were entitled to rely on the Carve-Out to ensure they would be paid ahead of Appellant. *Id.*

Finally, the Bankruptcy Court was satisfied that the tasks performed, and fees incurred, were reasonable under the circumstances of these chapter 11 cases. *See id.* at 889-90. The Retained Professionals were not guarantors of a successful result. *See id.* at 890. Appellant's financial advisor's testimony did not support a factual finding that Capstone was not qualified or that its work was not reasonable. *Id.* The Final Fee Order was entered on May 20, 2024. A1447.

16

### G.    The Final Dismissal Order

As contemplated by the initial dismissal order, on July 24, 2024, the Debtors filed a certification of counsel and request for entry of the final order dismissing the chapter 11 cases.  SA3321-37.  The Bankruptcy Court entered the Final Dismissal Order, dismissing the Debtors' chapter 11 cases, on July 25, 2024.  A1481-84.

### H.    The Consolidated Appeal

Appellant argues that the Bankruptcy Court erred in (1) concluding that the DIP Order allowed the payment of professional fees to the Retained Professionals over its objection, despite the unambiguous requirement that any payments must be approved by Appellant; (2) concluding that the interim payments made to the Retained Professionals without its approval were not subject to disgorgement; (3) concluding that the fees sought by the Retained Professionals were reasonable; (4) entering the Final Dismissal Order, which authorized payments to the Retained Professionals in violation of the DIP Order and the normal rules of priority.

## II.    JURISDICTION AND STANDARD OF REVIEW

Appeals from the Bankruptcy Court to this Court are governed by 28 U.S.C. § 158.  District courts have mandatory jurisdiction to hear appeals "from final judgments, orders, and decrees."  28 U.S.C. § 158(a)(1).  An order granting final allowance of professional fees is a final, appealable order.  *In re Boddy*, 950 F.2d 334, 336 (6th Cir. 1991) (fee awards are final for purposes of appeal "where the

17

order conclusively determine[s] the entire section 330 compensation to be paid"). "A bankruptcy court's dismissal of a Chapter 11 case is a final order." *In re Prospector Offshore Drilling S.a R.L.*, 2019 WL 1150563, at *5 (D. Del. Mar. 12, 2019), *aff'd* 2022 WL 1055574 (3d Cir. Apr. 8, 2022) (citations omitted).

A district court "review[s] the Bankruptcy Court['s] legal determinations de novo, its factual findings for clear error, and its exercise of discretion for abuse thereof." *In re Spansion Inc.,* 2011 WL 3268084, at *4 (D. Del. July 28, 2011), *aff'd* 507 F. App'x 125 (3d Cir. 2012) (quoting *In re O'Brien, Envtl. Energy, Inc*., 188 F.3d 116, 122 (3d Cir. 1999)). A bankruptcy court abuses its discretion if it "fails to apply the proper legal standard or to follow proper procedures in making the determination, or bases an award upon findings of fact that are clearly erroneous." *See In re Northwestern Corp.*, 332 B.R. 534, 536 (D. Del. 2005).

## III.  DISCUSSION

### A.  The Unambiguous Carve-Out Provision of the DIP Order Provides that the Retained Professionals' Fees and Expenses Are Senior to Any Obligations Owed to Appellant

At the heart of this appeal is the Bankruptcy Court's interpretation of the DIP Order. Because the DIP Order was an agreement negotiated by the parties, it must be interpreted using traditional methods of contract interpretation. *In re Trico Marine Servs.,* 450 B.R. 474, 482 (Bankr. D. Del. 2011). If the plain language of a contract "clearly manifest[s] the parties' intent," the court need look no further. *Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 76 (3d Cir. 2011).

18

"When a bankruptcy court has analyzed one of its own orders, 'an appellate court must distinguish between the review of a bankruptcy court's application of legal principles and the review of a bankruptcy court's actual interpretation of an ambiguous provision in its own order.'" *In re LTC Holdings, Inc.*, 10 F.4th 177, 184 (3d Cir. 2021) (quoting *In re Shenango Grp. Inc.*, 501 F.3d 338, 346 (3d Cir. 2007)). The Bankruptcy Court's application of legal principles to an unambiguous provision is reviewed *de novo*, whereas the interpretation of an ambiguous provision is reviewed for abuse of discretion. *Id.* The Bankruptcy Court's initial determination as to whether a provision is ambiguous is reviewed *de novo*. *Id.*

As the parties argued, and the Bankruptcy Court determined, I agree the DIP Order—including the language of the Carve-Out provision—is unambiguous. *See In re Allegiance Coal*, 661 B.R. at 878. Thus, I exercise plenary review over the application of legal principles to those unambiguous provisions.

The Bankruptcy Court held in two separate opinions that the plain and unambiguous terms of the DIP Order permit payments of the allowed fees and expenses of the Retained Professionals from the Carve-Out before any payment can be made to Appellant. *In re Allegiance Coal*, 661 B.R. at 880 (summarizing Letter Ruling as "[t]he Court concluded as a matter of law, based on the language of the order approving the DIP financing, that obligations that fell within the carve out to

19

the DIP lien were effectively the senior-most obligations in the debtors' capital structure") (summarizing Letter Ruling); *id.* at 888 (issuing a consistent ruling).

I agree that the plain language of the Carve-Out dictates this result. The Carve-Out subordinates Appellant's liens and claims to "*the payment of*" of the Retained Professionals' fees and expenses that meet three conditions. A754-55; *In re Allegiance Coal*, 661 B.R. at 878 (emphasis added). First, the fees and expenses must be within the "amounts set forth in the Approved Budget, including the professional fee accrual schedule attached to the Approved Budget." A754-55. The total amount set forth in the professional fee accrual schedule attached to the Approved Budget is $5,736,839, and the total amount paid to the Retained Professionals is $5,311,502. A821, SA3335. This first requirement is satisfied because the Retained Professional's fees and expenses are less than amount forth in the professional fee accrual schedule attached to the Approved Budget.

Second, the Retained Professionals' fees and expenses must be "allowed at any time, whether by interim order, procedural order, or otherwise." A755. All the fees and expenses paid to the Retained Professionals were allowed and paid pursuant to the interim compensation procedures order or other procedure orders, and also ultimately allowed and paid pursuant to the final fee order.

Third, the Retained Professionals fees and expenses must be incurred before a Carve-Out Trigger Notice is delivered. A755. Appellant never delivered a Carve-

20

Out Trigger Notice, and therefore all the Retained Professionals' fees and expenses were incurred before a Carve-Out Trigger notice was delivered. A1306.

The Final DIP Order expresses no other condition to "the payment of" the Retained Professionals' fees and expenses under the Carve-Out. A754-56.

### B. The Bankruptcy Court's Interpretation of the Carve-Out Does Not Conflict or Render Meaningless Other Portions of the DIP Order

Appellant argues that the Bankruptcy Court's flawed interpretation of the Carve-Out provision conflicts with other provisions of the DIP Order, which prohibited the Debtors from using any assets (cash collateral, DIP funds, or DIP collateral) to pay professional fees:

> [T]he plain language of the Final DIP Order was clear: as an express condition of obtaining the DIP loan from Collins St, the Debtors agreed not to make any payments to the Retained Professionals unless those payments were authorized by Collins St in an Approved Budget. Neither of the Approved Budgets agreed to by the parties and filed with the Bankruptcy Court authorized any payments to the Retained Professionals.

D.I. 24 at 23. As the Bankruptcy Court explained, the Carve-Out provides that the DIP liens are subordinate to "the payment of ... (iii) up to the amounts set forth in the Approved Budget, *including the amounts in the professional accrual schedule attached to the Approved Budget*, to the extent allowed at any time, whether by interim order, procedural order, or otherwise [any unpaid expenses of estate professionals]." A754-55 (emphasis added). In interpreting the DIP Order, the

Bankruptcy Court noted that the language of the Carve-Out provision (paragraph 17) is important for two separate reasons. *In re Allegiance Coal*, 661 B.R. at 887. First, the express reference to the accrual schedule makes clear that the Carve-Out, as of June 30, was the $5.75 million reflected in the approved budget as of that date. *See id.* "And consistent with the basic operation of a carve out as described in the letter opinion in the adversary proceeding, the DIP lender's recovery on its DIP loan is subordinated to the payments that are protected by the carve out." *Id.* Second, paragraph 17 provides "that the repayment of the DIP loan is subordinated to the repayment of 'the amounts set forth in the Approved Budget, *including* the amounts in the professional fee accrual schedule.'" *Id.* "As a matter of ordinary English," the Bankruptcy Court observed, "this language means that the accrual schedule is 'included' in the Approved Budget.  Accordingly, when the defined term "Approved Budget" is otherwise used in the DIP Order, there is at least a reasonable argument that the term also 'includes' the amounts set forth in the accrual schedule ... " *Id.* Finally, the Bankruptcy Court held that "the absence of any amount being shown as cash to be paid to estate professionals in any budget period means only that company's cash could not be used to pay professionals *in the period in question*. The DIP Order is otherwise clear, however, that the repayment of the DIP loan is subordinated to the payment of amounts protected by the Carve Out, which includes the professional fees shown as being accrued." *Id.* at 878.

Appellant asserts several arguments with respect to this interpretation of the DIP Order. "Rather than adhering to the unambiguous requirements of the Final DIP Order, the Bankruptcy Court instead relied on a single provision—the Carve-Out—to excuse the Debtors from complying with the Approved Budget requirement." D.I. 24 at 23. Appellant argues that the Carve-Out provision merely established that allowed professional fees would be entitled to higher priority than Appellant's own claims, should Appellant ever choose to approve payment of those fees. *Id.* at 3. The Bankruptcy Court's "interpretation effectively read the Approved Budget requirement out of the parties' agreement, permitting the Debtors to make payments to the Retained Professionals that were never included in any budget approved by [Appellant]." *Id.* at 24. According to Appellant, the fact that each of the two Approved Budgets listed accrued unpaid professional fees as "-" means that no approval was ever given to pay professional fees, so awarding fees under the Carve-Out provision cannot stand. In other words, it is Appellant's position that it could choose to wait until the end of the end of the chapter 11 cases to determine, in its sole discretion, whether the results of the Retained Professionals' efforts warranted payment of their fees and expenses. *See* D.I. 24 at 3, 13; D.I. 31 at 8, 11-16 (arguing that in a "free-fall" bankruptcy, the retained professionals are not guaranteed payment).

23

As the Bankruptcy Court noted, Appellant's argument relies on paragraphs 2–4 of the DIP Order, which operate to prohibit the *payment* of any professional fees out of either the DIP proceeds or its cash collateral, and the Approved Budget, which limits *payment* during a specified time frame.  Paragraph 2 of the DIP Order addresses the use of the proceeds of the DIP loan:

> Available financing and advances under the DIP Term Sheet shall be made to fund, *in accordance with the DIP Documents and the Approved Budget*, working capital and general corporate requirements of the Debtors, adequate protection to the Prepetition Noteholder, bankruptcy-related professional fees, costs, and expenses (including interest, fees, and expenses in accordance with this Final Order and the DIP Documents), and any other amounts required or allowed to be paid in accordance with this Final Order, *but only as and to the extent authorized by the Approved Budget* and the DIP Documents.

DIP Order ¶ 2 (emphasis added).  Paragraph 3 addresses the use of cash collateral and states that the "Debtors are authorized to use Cash Collateral *subject to and in accordance with the terms, conditions, and limitations set forth in this Final Order, the Approved Budget*, and the DIP Documents, without further approval by the Court." *Id*. ¶ 3.  Paragraphs 2 and 3 of the Final DIP Order, which only provide for the timing of payment, cannot override the priority scheme set forth in the Final DIP Order and Bankruptcy Code.  Neither of these provisions governs funding or payment of the Carve-Out, as they do not even so much as mention the Carve-Out.  Paragraph 4 mentions the Carve-Out (A735-38), but it does so only to clarify that,

even when Appellant has otherwise terminated the Debtors' use of cash collateral

after an event of default, the Debtors *may still use Appellant's cash collateral to*

*fund the Carve-Out:*

> The consent of the DIP Lender to the Approved Budget
> shall not be construed as a commitment of the DIP Lender
> to provide DIP Loans or of the DIP Lender or Prepetition
> Noteholder to permit the use of Cash Collateral (*subject to*
> *the Carve-Out*) after the occurrence of a Termination
> Event (as defined below) under this Final Order,
> regardless of whether the aggregate funds shown on the
> Approved Budget have been expended.

A736 (emphasis added). Paragraph 4's clarification that the Carve-Out must be

funded even after use of cash collateral is terminated, undermines, rather than

supports, Appellant's position because it further demonstrates that funding and

paying the Carve-Out is the first priority, and, an inescapable requirement of the

Final DIP Order. I see no conflict between the Carve-Out provision of the Final DIP

Order and these other provisions that do not mention the Carve-Out, except to

recognize its primacy.

I agree with Appellees that Appellant's arguments rest on a fundamental

misunderstanding and conflating of three separate concepts: (1) the *timing of*

*payment* of the Retained Professionals' fees and expenses under the Final DIP

Order, (2) the *allowance* of those fees and expenses under section 330 of the

Bankruptcy Code, and (3) the *priority* of those fees and expenses under both the

Final DIP Order and the Bankruptcy Code. These are all distinct concepts.

While Appellant focuses on language in the Final DIP Order that prohibited *payment* of the Retained Professionals' fees and expenses during a time they were not covered by an Approved Budget, it fails to explain why that language would prohibit the *allowance* or *alter the distributional priority* of the Retained Professionals' fees and expenses—a distributional priority made clear by paragraph 17 and numerous other provisions in the Final DIP Order.  For example, in addition to paragraph 17, paragraph 21(g) of the Final DIP Order provides that, upon an event of default, Appellant "may at all times continue to collect and sweep cash as provided herein or as provided in the DIP Documents, *provided that sufficient funds are (or have been) set aside to fund the Carve-Out*."  A-762 (emphasis added). Likewise, paragraph 27 of the Final DIP Order, governing Appellant's application of proceeds of its collateral, makes clear that, after an event of default, the Debtors are "authorized to remit to the DIP Lender, *subject to the payment of the Carve-Out*, one hundred percent (100%) of all collections on, and proceeds of, the DIP Collateral until the DIP Obligations are paid in full[.]"  A769-70 (emphasis added).

As set forth in the Opinion, just because the DIP Order did not provide for a particular time to make payments to the Retained Professionals during the period encompassed by the Approved Budget does not mean that (a) the Retained Professionals fees cannot be approved by the Bankruptcy Court as allowed administrative claims or (b) the Bankruptcy Court cannot authorize the Debtors to

26

make payments in accordance with the priority scheme set out by the Bankruptcy Code and the Final DIP Order at the conclusion of the case.

I disagree with Appellant that there is any conflict (or tension) between the provisions at issue. The Bankruptcy Court's reading of the Carve-Out provision does not conflict with the payment provisions of the DIP Order because the Carve-Out establishes *priority* of payments, not the *timing* of payments. To the extent that there is any tension, I agree with the Bankruptcy Court's interpretation, which reconciled all of these provisions so that each of them has meaning and concluded that they consistently point to the Carve-Out being the senior-most obligation that must be paid before Appellant receives anything.[5]

## C.   Final Fee Order

This Court reviews the Bankruptcy Court's fee award for abuse of discretion. *See In re Northwestern Corp.*, 332 B.R. at 536. Section 330(a) of the Bankruptcy Code permits bankruptcy courts to award reasonable compensation for actual,

---

[5] Because I agree with the Bankruptcy Court's interpretation of the unambiguous DIP Order, I need not consider the parties' arguments regarding whether extrinsic evidence adduced at the hearing further supports that result, or whether Appellant's arguments are barred by *res judicata*, collateral estoppel, and law of the case based on the final Letter Opinion. Additionally, I Court agree that even if interim payments made by the Debtors were unauthorized at the time they were made, the result at the end of the bankruptcy cases would be the same because the documents made it clear that in the end, repayment of the DIP loan was subordinate to the Carve-Out. Accordingly, any premature payment of funds to parties who were ultimately entitled to receive them caused Appellant no injury, and the Bankruptcy Court committed no error in failing to order the disgorgement of interim payments.

necessary services rendered to the debtor's estate. In evaluating reasonableness, as the Third Circuit has explained, a reviewing court considers: (i) the nature of the services; (ii) the extent of the services; (iii) the value of the services; (iv) the time spent on the services; and (v) the cost of comparable services in non-bankruptcy cases. *In re Busy Beaver Bldg. Ctrs. Inc.*, 19 F.3d 833, 840 (3d Cir. 1994). A bankruptcy court has wide discretion to review fee applications. *In re Lan Assocs., XL L.P.*, 192 F.3d 109, 122-23 (3d Cir. 1999).

Importantly, the reasonableness of professional fees is not evaluated with the benefit of hindsight. *In re Hosp. Partners of Am. Inc.*, 597 B.R. 763, 766 (Bankr. D. Del. 2019). Additionally, the Third Circuit has instructed that bankruptcy courts should not "become enmeshed in a meticulous analysis of every detailed facet of the professional representation." *Busy Beaver*, 19 F.3d at 844-45 (quoting *Lindy Bros. Builders of Philadelphia v. Am. Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 116–17 (3d Cir. 1976)). The reviewing court is only required to correct reasonably discernible abuses and is not expected to pin down to the nearest dollar the precise fee to which a professional is entitled. *Busy Beaver*, 19 F.3d at 845.

The fee applicant bears the burden of persuasion to establish that the fees are reasonable and necessary. *See, e.g.*, *In re Smith*, 331 B.R. 622, 627 (Bankr. M.D. Pa. 2005). "The applicant must provide detailed records identifying the professionals involved, the specific tasks they performed, the amount of time spent

on each task, and the applicable billing rate, as well as an explanation of the expenses as required under the [applicable] rules[.]" *In re Stephanie's Too, LLC,* 2021 WL 5769316, at *2 (Bankr. D.N.J. Dec. 3, 2021) (internal citations omitted). "[O]nce this information is provided, the applicant has created a *prima facie* case, and any objector to the application bears a burden of production with regard to evidence that would justify reducing the fees sought." *Id.* (internal citation and quotation omitted). Here, the Retained Professionals presented fee applications containing nearly 800 pages of detailed time and expense records to establish their *prima facie* entitlement to the fees and expenses.

Appellant filed an omnibus objection (*see* A1182-1220) that primarily restates its disappointment with the conduct of the sale and outcome of the cases along with its argument that DIP Order does not permit the payment of any professional fees. *See* A1185-A1210. With respect to reasonableness, Appellant raised three arguments, all of which were rejected by the Bankruptcy Court.

### 1.    Prepetition Documents From the Debtors' Parent

First, Appellant argued that prepetition valuation documents from the Debtors' Australian parent's insolvency proceeding "indicat[e] that the Debtors' parent, and thus presumably the Debtors, knew that the Debtors' assets were worth ***substantially less*** than what was represented to this Court." Specifically, in an internal document titled "Safe Harbour Plan" prepared by Allegiance Coal Ltd (the

Debtors' Australian parent) and dated February 14, 2023 (one week before these cases were filed), it was admitted that (a) for soon-to-be debtor New Elk Coal Company LLC ("NECC"), it was "likely to be challenging" to sell the NECC mines and leases and (b) for soon to be debtor Black Warrior Minerals, Inc. ("BWM") "[s]elling the company as a going concern is certainly possible, but also likely to be challenging" and that the "[d]isposal of the plant and equipment is the most likely scenario." *See* B.D.I. 703-1 (Declaration of David J. Beckman) ¶ 6 & Ex. 1. Based on the foregoing, Appellant asserted that "the Debtors (and by extension the Debtors' professionals) knew or should have known that the Debtors' assets were worth substantially less than represented to the Court and [Appellant]" and that "such services were not necessary for the administration of the estates and would likely not benefit the Debtors." A1203. While Appellant never requested discovery on this issue, it asserted that this information "merits inquiry by the [Bankruptcy] Court of what the Debtors and their Retained Professionals knew concerning these valuation discrepancies." A1215. Appellant cites its own valuations in support of its contention that the Debtors "significantly overstated" the value of the Debtors' assets to the Bankruptcy Court and Debtors professionals knew a sale of such assets would be challenging.[6] *See* D.I. 1214.

---

[6] *Compare* A212-14 (R. Dehney, J. Romcke) at 39:17-41:23 (using a pre-tax discounted cash flow methodology, stating that the value of New Elk was $105 million and that the value of the Black Warrior Mine was $63 million) *with*

If Appellant was certain that the sale process would fail, is unclear why

Appellant funded that process, apart from its apparent belief that if the sale process

did not go Appellant's way, Appellant would not have to pay the Retained

Professionals who ran it.  In any event, while not discussed in the Opinion, the cited

internal documents from the Debtors' parent, indicating that sale of the business was

"certainly possible" or "likely to be challenging," without more, do not demonstrate

an abuse of discretion in entry of the Final Fee Order, as those statements do not

rebut the reasonableness of the Retained Professionals' fees and expenses and do not

support Appellant's claim that those fees and expenses should not be awarded

because those "professionals [were] engaging in worthless endeavors or otherwise

working on unproductive or unnecessary matters."  A1215.

### 2.    Capstone's Alleged Lack of Experience

Second, Appellant objected on the basis that Capstone, the Debtors'

investment banker and financial advisor, "woefully failed to fulfill its duties to the

Debtors, lacked the requisite experience, and its performance provided no value to

---

(i) Appellant's June 27, 2022, valuation report prepared by Cushman & Wakefield
regarding the value of the Debtors' machinery and equipment assessed the NECC
liquidation value as $16.9 million and the BWM liquidation value as $5 million,
approximately one year before the Debtors' sale process (B.D.I. 703-3) and
(ii) A1215 (Appellant's assertion, without citation to the record, that a separate
valuation report by CSA Global Pty Ltd, dated June 16, 2022, stated that the NECC
mining lease was worth approximately $100 million and the BWM mining lease was
worth approximately $20 million).

the Debtors' doomed sale process." A1203.

The Bankruptcy Court noted that "[t]he case law is, of course, clear that the professionals involved in a case are not guarantors of the result" and "for the related proposition, which is just a commonsense point, that one must view the reasonableness of a professional's work based on the circumstances present at the time the professional undertook to perform the work, not with the benefit of hindsight. *In re Allegiance Coal,* 661 B.R. at 890 (citing *In re Hospital Partners of Am., Inc.*, 597 B.R. 763, 766 (Bankr. D. Del. 2019)). With respect to the declaration and testimony of Appellant's financial advisor, David Beckman of FTI Consulting, Inc., that Capstone and its personnel who worked on the sale process had far more limited experience in distressed coal transactions than he, the Bankruptcy Court noted that Beckman's extensive experience in distressed coal company sales, while impressive, "does not mean that Capstone was not qualified or that the work it did was not reasonable." *Id.* The Bankruptcy Court's rejection of Appellant's challenge to Capstone's experience and its blame for the failed sale does not demonstrate an abuse of discretion.

### 3.    Vague or "Lumped" Time Entries

Finally, Appellant objected on the basis that many of the Retained Professionals' time entries were overly vague or exhibited "lumping" of time entries in violation of the Local Rules and were therefore unreasonable. (A1218 (citing

Bankr. D. Del. Local Rule 2016-2(d)(viii) ("Activity descriptions shall not be lumped – each activity shall have a separate description and a time allotment")). Apart from this description, in support of its objection, Appellant simply attached 746 pages time entries submitted by the Retained Professionals in which Appellant had highlighted those it challenged as unreasonable. *See* B.D.I. 703-4. Appellant challenges only a handful of hours for most of the Retained Professionals. *See* B.D.I. 703-4 at 1 of 746 (totaling challenged fees for each entity). Appellant, on the other hand, challenges $393,793.00. of Capstone's fees (related to 758.7 hours of services). *Id.* No further argument or evidence, beyond the highlighted exhibit time sheets, was presented to the Bankruptcy Court.

As Appellant correctly points out, while the order approving Capstone's retention as the Debtors' investment banker approved the terms of Capstone's compensation under its engagement agreement pursuant to section 328(a) of the Bankruptcy Code, the Bankruptcy Court's retention order incorporated the requirements of section 330: "Capstone shall file fee applications for interim and final allowance of compensation and reimbursement of expenses . . . pursuant to the procedures set forth in sections 330 and 331 of the Bankruptcy Code ..." A-538 (emphasis added). Thus, Capstone—like the other Retained Professionals—to comply with section 330's requirements.

The Bankruptcy Court observed that "the better practice is for a professional's

33

time entries to indicate how much time is spent performing each of the tasks being

billed, rather than combining multiple tasks in a single entry," as "detailed time

records, as most of the professionals in the case have submitted, certainly facilitate

the Court's review of the reasonableness of the time spent on each task." *In re

Allegiance Coal*, 661 B.R. at 890. "That said," the Bankruptcy Court held:

> [I]n the circumstances of this case, the Court is satisfied that
> the billing records submitted contained enough detail to
> permit the Court to form a judgment with respect to the
> reasonableness of the tasks performed and the fees being
> charged. Based on that review, the Court concludes that the
> work performed by each of the estate professionals was
> reasonable in light of the circumstances presented and that
> the fees sought are in the range of what one would expect in
> a case of comparable size and complexity. So based on the
> whole record, the Court believes it appropriate to enter an
> order that allows each of the fee applications at issue.

*Id.* Appellant argues on appeal that the Bankruptcy Court "abandoned" its duty to

review the fee applications, failed to set forth its reasoning or meaningfully examine

the § 330 factors, and abused its discretion by allowing lumped-sum requests for

fees that were unreasonable. I disagree that the Bankruptcy Court failed to review

or set forth its reasoning in approving the fees and expenses of the Retained

Professionals. The Opinion as a whole thoroughly outlines the challenges and

complexity of these contentious chapter 11 cases attempting to sell assets of a

distressed nature in a volatile industry. There was no need for the Bankruptcy Court

restate those circumstances and findings in the context of this particular ruling. Any

34

failure to do so does not rise to an abuse of discretion.

With respect to Capstone's lumped time, I agree that certain of Capstone's time entries, such as 100 hours over an eleven-month period (in a single entry) totaling its professionals' "conference calls with the bankruptcy team, the client, potential investors, team members, the weekly update MNAT call" provide little or information regarding the tasks undertaken or services provided. A-1146. However, those entries are not inconsistent with the Bankruptcy Court's conclusion that the total hours were "reasonable in light of the circumstances presented and that the fees sought are in the range of what one would expect in a case of comparable size and complexity." *In re Allegiance Coal*, 661 B.R. at 890. Approval in the context of the facts and circumstances of this does not rise to the level of an abuse of discretion.

### D.    Final Dismissal Order

Finally, whether the Bankruptcy Court properly entered the Final Dismissal Order in accordance with the payment priorities established in the DIP Order, the Letter Opinion, and the Bankruptcy Code is a legal question that this Court reviews *de novo. See In re Energy Future Holdings Corp.*, 558 B.R. at 686.

Appellant asserts that the Bankruptcy Court erred when it entered the Final Dismissal Order, which authorized payments to the Retained Professionals in accordance with the Final DIP Order and the Letter Opinion, as being a "structured

dismissal" in violation of the Supreme Court's decision in *Cryzewski v. Jevic Holding Corp.*, 580 U.S. 451 (2017)[7] and the Bankruptcy Code.  I agree, however that, as noted by the Bankruptcy Court in its Opinion, it is just the opposite—*Jevic* compels the result reached by the Bankruptcy Court in this dispute.  As noted by the Bankruptcy Court in the final, non-appealable Letter Opinion:

> "Carve outs are agreements between a secured lender and the debtor-in-possession that provide that administrative expenses may be paid out from a secured creditor's collateral." The mechanic of the carve-out is typically that upon "the termination of the DIP financing and notice from the DIP lenders to certain interested parties ... a certain reserve amount will be carved-out for the payment of the fees and expenses of professionals that are incurred after the delivery of such notice."

A1502.  In the Letter Opinion, the Bankruptcy Court "concluded as a matter of law, based on the language of the order approving the DIP financing, that obligations that fell within the carve out to the DIP lien were effectively the senior-most obligations in the debtors' capital structure." A1459.  Because the Carve-Out was senior to any obligations of the Debtors to Appellant, "to the extent the debtors found themselves at the end of the bankruptcy case in the possession of cash, the professionals were entitled to rely on the carve out to ensure that they were paid from those funds ahead

---

[7] *Jevic,* 580 U.S. at 466 (holding court lacks authority, upon "ordering a dismissal to [authorize the debtor to] make general end-of-case distributions of estate assets to creditors" that "would be flatly impermissible in a Chapter 7 liquidation or a Chapter 11 plan because they violate priority without the impaired creditors' consent").

of [Appellant]." *In re Allegiance Coal*, 661 B.R. at 889. Thus, it was proper for the Final Dismissal Order to "provide that the distribution of the debtors' remaining cash should be paid, up to the amount of the carve out, to the debtors' professionals (to the extent those professionals' fee applications are allowed under § 330 of the Bankruptcy Code) before any such proceeds are paid to [Appellant]." *Id.* at 889-90.

## IV. CONCLUSION

Appellant's frustration is understandable. As the Bankruptcy Court observed, "[Appellant's] view from the outset was that the effort to reorganize the debtors was a fool's errand and that the value of its collateral would have been better preserved had the case had proceeded differently. In retrospect, [Appellant] may well have been right." *Id.* at 890. Appellant's frustration does not, however, provide a basis for re-writing the terms of the DIP Order. For the reasons stated above, I will affirm the Final Fee Order and Final Dismissal Order.

The Court will issue an Order consistent with this Opinion.